WILLIAM L. MOFFAT, JR., Respondent, v. THE GERRY ESTATES, INC., Appellant.

First Department, May 3, 1940.

*Frederick Evan Crane* of counsel [*Charles R. Barrett* and *Nims & Verdi* with him on the brief; *Regan & Barrett*, attorneys], for the appellant.

*Alexander Pfeiffer* of counsel [*Pfeiffer & Crames*, attorneys], for the respondent.

CALLAHAN, J.   Plaintiff has recovered a judgment based on a verdict for $27,000, for brokerage commissions claimed to have been earned in obtaining a tenant for defendant's real property at Forty-second street and Seventh avenue, New York city, known as " The Rialto Theatre Building."

The proposed lease was for twenty years, with several renewal periods.   It involved the erection of a new building on the premises and the payment of upwards of $2,000,000 in rent.

While William L. Moffat, Jr., is the plaintiff, he took no part in the negotiations involved in the suit; they were handled by one Paul P. Wrigley, who was a licensed salesman in Moffat's employ.

The circumstances under which plaintiff became interested as broker in this transaction are as follows: In January, 1934, one Morris Glaser, a real estate operator, visited Moffat's office, where he met Wrigley, who agreed, at Glaser's request, to take up the matter of a proposed lease with the defendant, the owner of the premises.   After writing several letters to defendant containing offers which were rejected, Wrigley finally made an offer which defendant was willing to discuss.   Wrigley thereupon visited defendant's office, where, before any negotiations were commenced, he signed the following letter addressed to defendant: " The undersigned, a broker, in order to induce you to enter into negotiations for a lease of your property, North West Corner of 7th Ave. & 42nd St. in the City of New York, to a prospective tenant to be produced by the undersigned does hereby admit and agree that the undersigned shall not be entitled to any compensation or commission whatsoever unless and until a written lease containing all provisions which may be approved and required by you and your counsel shall be duly executed and delivered."

Plaintiff concedes that this agreement measures his rights as broker.   Plaintiff further concedes that no written lease containing provisions " approved " or " required " by the landlord was ever executed or delivered.   Accordingly under the terms of the hiring, plaintiff was not entitled to commissions unless the tenant's failure to execute the lease was due to some misconduct amounting

to bad faith on the part of the defendant. (*Saum* v. *Capital Realty Development Corporation*, 268 N. Y. 335; *Colvin* v. *Post Mortgage & Land Co.*, 225 id. 510.)

The theory on which plaintiff has recovered in this action is that the defendant, through Robert L. Gerry, Jr., made representations to Wrigley that defendant would give the proposed tenants "assurance" that actual, physical possession of the premises would be obtained by the tenant before the date set in the lease for the erection of the new building. That is to say, it has been found by the verdict of the jury herein that defendant promised to give to the proposed tenant such assurance as was required that it would obtain physical possession, and that defendant thereafter refused to abide by its promise.

The lease which the defendant offered the proposed tenant provided that the erection of the new building was to be commenced before October 31, 1937, with a penalty of $100,000 if such work was not commenced by that date. The landlord refused to vary this proposal.

Plaintiff claims that it was this insistence by the landlord that caused the tenant to refuse to take the lease, and that such attitude of the defendant violated the earlier promise given to the broker. Plaintiff further claims that such conduct amounted to bad faith.

The issue as to whether any representation, as contended for by plaintiff, had been made by the defendant was submitted to the jury as the sole issue of fact in the case. No exception was taken by either side to the court's charge. The defendant, however, moved to dismiss the complaint for insufficient proof, both at the close of the plaintiff's case and at the close of the whole case.

Upon this appeal defendant asserts several grounds for reversal. We think that essentially two questions are involved: (1) Whether the plaintiff, as broker, was guilty of such a breach of his duty, in not revealing certain facts to his employer, as to prevent his recovering commissions, and (2) whether the defendant was guilty of the bad faith referred to.

In considering the first question, it might be well to first take up the rules of law applicable to the conduct of a broker under the circumstances herein involved.

It is well settled that a broker must act honestly, and with candor towards his employer. He is required to disclose to the employer all the material information which he may possess or obtain concerning the transaction involved. (*Dickinson* v. *Tysen*, 209 N. Y. 395; *Greenfield* v. *Bausch*, 238 App. Div. 52; *Silberkraus* v. *Reinhard*, 221 id. 615; *Wendt* v. *Fischer*, 215 id. 196; *Howard*

v. *McCredie*, 198 id. 49.) The necessity of such disclosure, while commonly a condition of the employment, may be waived by the employer. (*Ostroff* v. *Doctor*, 238 N. Y. 264, 265.)

The foregoing statement of the law makes it clear that a broker who gives his employer false information as to a material matter in connection with a transaction is prevented from recovering commissions. (See, also, *Roome* v. *Robinson*, 99 App. Div. 143, 148.)

The evidence in this case discloses that Wrigley had contact only with Glaser as the proposed new tenant. Early in the negotiations he was taken by Glaser to the office of Moses H. Grossman, an attorney, who was introduced to Wrigley as the attorney for the proposed tenant. Thereafter Grossman and assistants in his office purported to act as attorneys for the proposed tenant; and Grossman, to a large extent, managed what he termed the syndicate trying to complete the deal. Wrigley knew that Glaser was not financially able to handle the transaction and that he was planning to interest men of wealth in the project, and to form a syndicate for that purpose. He was told by Grossman that he had interested a number of prospective investors, but Wrigley did not discuss the lease directly with any of such persons.

A corporation was formed by Grossman, known as Knickerbocker Estates, Inc., which was to be the tenant under the proposed lease. The name of the proposed tenant was revealed to the defendant, and, while defendant did not object to a corporate tenant, it insisted on knowing who were the financial backers of the proposed corporation before carrying on further negotiations.

Wrigley conceded that Robert L. Gerry, Jr., who represented the defendant, demanded to know the identity of the persons backing the corporation, and that Gerry said that it was important to defendant to know that it was dealing with substantial people.

Defendant was justified in obtaining this information before it permitted its existing building to be demolished and a new building to be put up. Though defendant was dealing with a corporation, and, though the proposed lease provided for security for performance of the lease and for the new construction, defendant had the right, as employer of plaintiff, to obtain whatever information it thought requisite for its protection in the transaction.

The acceptance of the corporation was not intended as a waiver of defendant's right to such information, for it is conceded that defendant insisted on obtaining the information.

Wrigley testified that he consulted Grossman after receiving the defendant's demand for information, and after such consultation he wrote defendant the following letter (Plaintiff's Exhibit 7):

" With reference to our letter of Feb. 9th, we are listing below the names of our clients who are interested in leasing your property at the northwest corner of 42nd St. and 7th Avenue. The corporation will be known as Knickerbocker Estates, Inc., and the following men will be among those on the Board of Directors:

" Mr. Edwin H. Hydeman, formerly of the firm of Hydeman and Lassner. Now retired.

" Mr. Nathan Shulman, of the Mastan Co., Inc., 350 5th Ave., financing.

" Mr. Lazar Kaplan, of S. Kaplan Co., 64 Fulton St., diamond merchants.

" Mr. Leo B. Simonson will probably be on the board, although this is not yet definite.

"All of these are men of the highest character and financial responsibility, as any report on them would show.

" Judge Grossman, of the firm of House, Grossman and Vorhaus, will be counsel to the corporation. He informs me that should you so desire, he will create a voting trust to control this property and will act as sole voting trustee.

" We hope that the above information will prove satisfactory.

" Very truly yours,

" PAUL P. WRIGLEY."

·The four men named in the foregoing letter were men of substantial financial standing.

It was admitted by witnesses called by plaintiff on the trial of this action that none of the men named in the letter had actually agreed to put any money into Knickerbocker Estates at the time plaintiff's Exhibit 7 was sent to defendant. According to the testimony, Grossman had consulted these men before such letter was sent, and endeavored to interest them in the syndicate. They had responded that, while they might be interested in the project, they would make no commitment in connection therewith until they saw the terms of the proposed lease. They did consent, however, to the use of their names as members of the board of directors of the proposed corporation, Knickerbocker Estates, Inc., even though they did not invest therein. In fact, however, they were never elected directors.

A reading of the letter (plaintiff's Exhibit 7) discloses, however, that all of the foregoing facts were not revealed by plaintiff to defendant. While the letter did state that the four men named would be among those on the board of directors, its opening phrase states that Wrigley in revealing these names was listing " the names of our clients who are interested in leasing your property."

Subsequently, all of the men named in the letter, except Kaplan, dropped the project. None of the others would take a financial interest in it.

While there is some proof that during the course of later negotiations statements were made to defendant, or its lawyer, that some change was contemplated in the personnel of the syndicate which was backing the Knickerbocker Estates, Inc., there is no proof that plaintiff ever advised defendant that three of the proposed " clients " had refused to invest.

Wrigley admitted that he knew that the identity of those behind Knickerbocker Estates, Inc., was considered of great importance by defendant. Shortly after the letter (plaintiff's Exhibit 7) was sent by plaintiff, Wrigley, together with Robert L. Gerry, Jr., representing defendant, visited a number of banks in order to obtain information concerning the financial standing of the four men named.

The real situation that developed in connection with the syndicate was that only Kaplan of the four men named agreed to invest any money in the Knickerbocker Estates, Inc.

The proposed lease required the tenant to deposit $75,000 at the time of closing. On May 4, 1934, when Knickerbocker Estates, Inc., made its abortive offer to take the lease, Grossman tendered certified checks amounting to $75,000. Of this sum, either $25,000 or $15,000 was Kaplan's; $10,000 represented an investment by Grossman's wife, and $25,000 was put up by one Amron. Grossman could not remember who had advanced the balance.

Glaser, who had been the prime mover in the transaction, testified as a witness for the defendant and said that of the $75,000, $25,000 had been raised by having Moffat and Wrigley pledge their commissions on the deal with a money lender.

Whether or not the latter statement was true, it is plain that the investors interested in this syndicate were substantially different from those revealed in the letter (plaintiff's Exhibit 7), and that defendant had never been informed of the true facts with respect to the " backers " of the corporation.

While it may be that Wrigley relied to some extent on information received from Grossman with respect to the names of the persons interested in the syndicate, we think that Wrigley would be bound to state the source of his information if he relied on the same; and where he purported to vouch for the facts, as he did in his letter, he is bound by the statements contained therein.

For the reasons above indicated, we would be constrained to reverse the judgment, and dismiss the complaint, if it was clear that the point had been sufficiently raised upon the trial. We find that

the defendant did not specifically indicate any ground for dismissal when its motions were made for that relief at Trial Term. Nor did defendant ask that any issue concerning the broker's breach of duty be submitted to the jury. We have determined, however, that the judgment must be reversed, and a new trial ordered, for the reason that the finding by the jury that defendant was guilty of bad faith in this transaction (in that it had represented to the broker that it would give assurance to any proposed tenant that physical possession of the property would be obtained within a limited time) was against the weight of the evidence.

It appears from the evidence in this case that the Rialto Theatre Building was leased in 1919 to a tenant known as Orbis Mundi Realty Corporation. This lease ran until 1939. Orbis Mundi had subleased to four subtenants for similar terms. Prior to the time that plaintiff became interested in attempting to lease the building, Orbis Mundi had fallen behind in its rent. Negotiations had taken place between the defendant and Orbis Mundi which, in 1933, resulted in agreements reducing the rent and modifying the main lease, so that after October 31, 1935, the lease was subject to a sixty-day cancellation clause. Orbis Mundi had also agreed to obtain modifications of its subleases so that they would contain similar sixty-day cancellation clauses. Defendant introduced evidence to establish that Orbis Mundi had in fact obtained such agreements in writing from its subtenants. Wrigley obtained copies of the Orbis Mundi lease and the agreements modifying it from defendants and delivered same to Grossman.

Knickerbocker Estates, Inc., the proposed tenant, therefore, was fully advised of the existence of the lease and subleases, and of the arrangement to cancel them. During the course of the negotiations in connection with drafting a proposed new lease to Knickerbocker Estates, Inc., at least three separate drafts were prepared by defendant landlord and submitted to Grossman. In each and every one of these drafts a clause was inserted whereby Knickerbocker Estates, Inc., agreed to take the property subject to existing leases.

It must be remembered that these negotiations between plaintiff and defendant were going on in the early part of 1934. Under the terms of the proposed new lease Knickerbocker Estates, Inc., was to take over the existing leases and turn over to the landlord such sums as the existing tenants might pay as rent while they remained in possession.

The erection of the proposed new building was not required to commence until October 31, 1937, which was three and one-half years from the time that negotiations were being carried on and two years from the time the cancellation clauses became effective;

so that Knickerbocker Estates, Inc., would have had at least two years to obtain possession under leases which had sixty-day cancellation clauses therein.

Plaintiff lays great stress on the unreasonable nature of the position taken by the landlord-defendant with respect to possession. It seems to us that in the situation above referred to there was nothing unreasonable about the defendant's position. But, assuming the landlord's position was unreasonable, it had the right to insist on such terms as it saw fit, in the absence of bad faith with respect to plaintiff's employment.

That plaintiff knew of the existing lease, and that the proposed tenant was to take subject to same is conceded by plaintiff. In fact plaintiff's commission was figured in part on the rent which might be received from Orbis Mundi while it remained in possession after the commencement of the new term.

Plaintiff has recovered herein upon the theory that the lease fell through because defendant in bad faith refused to give " assurance " to Knickerbocker that the latter would be put in actual physical possession of the premises in sufficient time before October 1, 1937, to permit it to carry out its covenant to commence demolition of the old building on that date. An examination of the testimony of Wrigley concerning Gerry's representations on this subject fails to disclose any representation that the defendant would assure the new tenant that it could obtain physical possession. Wrigley's testimony on the subject, on the other hand, was to the effect that defendant, through Robert L. Gerry, Jr., had stated that it would give assurance that existing leases had sixty-day cancellation clauses. The difference between the representation claimed and that proved is apparent.

If the sole representation made by the defendant was that it warranted that there were cancellation clauses in the existing lease and sublease, the proof revealed no breach of such a representation, for, in truth and in fact, such cancellation clauses did exist.

The distinction between a representation concerning the existence of cancellation clauses and one warranting that the Knickerbocker Estates, Inc., would obtain possession before a certain date seems to have been overlooked by the trial court in submitting the case to the jury. The court, in its charge, discussed these claims as if they were alike. However, as there was no exception taken to the court's charge, we must ascertain whether there was sufficient credible evidence produced by the plaintiff to establish that the defendant had given assurance that Knickerbocker Estates would be placed in actual physical possession. We find no direct testimony as to such a representation. Such proof was essential in establishing a claim of bad faith.

Wrigley testified at least three times concerning the nature of the conversation had between himself and Gerry. On each occasion on giving such conversation, he said, in substance, that Gerry represented that the subleases could be canceled on sixty days' notice. Wrigley said that he asked Gerry whether the tenant might be assured of this fact, because they were required to complete the proposed new building at a certain time, and Gerry said that defendant would give whatever assurance was required on that subject. On one typical occasion Wrigley gave the conversation as follows: He said that he and Mr. Gerry had been discussing the Orbis Mundi lease and the terms thereof, and that Mr. Gerry said to him: "'You don't need to worry about the subleases, because they can all be cancelled on sixty days' notice.' I said, 'how can my people be sure of that?' He said, 'we will give them that assurance — what assurance is required,' words to that effect."

On another occasion Wrigley testified concerning conversation with Gerry as follows: "We were discussing the possibility of getting them out of the premises sooner than the end of their lease. * * * Mr. Gerry said 'As to the subleases you don't need to worry,' and so forth."

It is clear that if the foregoing constituted all of the proof in the case there would be no evidence on which to submit to the jury the question as to whether there had been any representation concerning placing Knickerbocker Estates, Inc., in physical possession of the premises. However, in addition to the foregoing, we find that Wrigley testified to a number of conversations he had with Glaser and Grossman with respect to what Gerry had told him. In relating these conversations, instead of using language to the effect as above set forth, to wit, that Gerry had assured him that there were sixty-day cancellation clauses, he said that he had told Grossman that the assurance received from Gerry was that defendant would see that the tenant got possession.

There was also a great deal of testimony received concerning statements made by Wrigley in the presence of defendant's attorney in connection with the negotiations had in attempting to close the lease. Again statements were received in evidence as to what Wrigley had said on these occasions in the absence of Mr. Gerry.

Much of this testimony was received without objection. Assuming, therefore, that it was entitled to full consideration by the jury, we fail to find that it had sufficient probative force to warrant a finding of a representation by defendant that it would place Knickerbocker Estates, Inc., in physical possession of the property, or of such probative force as to warrant a finding of bad faith. The determination of the question as to whether defendant's conduct

had amounted to bad faith must be based on a consideration of what Gerry told Wrigley.

Wrigley swore that Gerry had merely told him that the leases and subleases contained sixty-day cancellation clauses. The act that, in relating such representations to others he had asserted that the representations included a promise that the tenant would be placed in physical possession, constitutes no proof of a representation by Gerry amounting to bad faith.

The large verdict obtained by plaintiff in this case could only be based upon a finding by the jury that Gerry had represented to Wrigley that the proposed tenant would be given physical possession. We are convinced that the finding of the jury, to the effect that such a representation was made, is clearly contrary to the weight of the credible evidence.

In addition to the oral testimony above set forth, we find that in a document prepared by Wrigley himself, which he called " an outline of the proposed lease," there is not a word concerning any promise that the tenant would be put in possession. Instead the outline states that the tenant would take over the present leases. The written documents and the history of the transaction strongly support the defendant's testimony that it gave no promise to put the tenant in actual possession.

In addition to the testimony of Gerry and his attorney on this subject denying any such promise, defendant called Glaser as a defendant's witness. Glaser flatly repudiated the claim of plaintiff, saying that the reason why the lease had not been executed was that Grossman was unable to obtain sufficient financial backing for the project. Glaser denied that he ever heard of any representation by the landlord that it would assure Knickerbocker Estates, Inc., actual physical possession until the date of the last meeting, when a suggestion was made by Grossman that Wrigley had advised him (Grossman) that such a promise had been made.

While we recognize that the credibility of the various witnesses in this case was for the jury, we also recognize that this is the claim of a broker who had agreed, in writing, that he would receive no commissions until a lease " approved " by the landlord was executed and delivered. The broker concedes that no such lease has been entered into. In order to recover the broker must establish by a fair preponderance of the credible evidence that the transaction fell through because of the defendant's bad faith. A careful examination of the record in this case satisfies us that the finding of bad faith is against the weight of the credible evidence.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event.

MARTIN, P. J., and DORE, J., concur.

COHN, J. (concurring). I concur upon the ground that the verdict of the jury which necessarily implied a finding that defendant in fact had made a representation that it would place Knickerbocker Estates, Inc., in physical possession of the property before October 1, 1937, was contrary to the weight of the credible evidence.

O'MALLEY, J., concurs.

Judgment unanimously reversed and a new trial ordered, with costs to the appellant to abide the event.